**DISTRICT OF COLUMBIA, Petitioner,**

v.

**ACF INDUSTRIES, INCORPORATED,**
**Respondent.**

No. 18898.

United States Court of Appeals
District of Columbia Circuit.

Argued April 7, 1965.

Decided Aug. 12, 1965.

Mr. Peter H. Wolf, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and Henry E. Wixon, Asst. Corp. Counsel, were on the brief, for petitioner.

Mr. Rourke J. Sheehan, Washington, D. C., for respondent.

Before WASHINGTON, Circuit Judge, BASTIAN, Senior Circuit Judge, and WRIGHT, Circuit Judge.

WRIGHT, Circuit Judge.

In 1959, respondent ACF Industries sold an unincorporated division of its operations, referred to as Nuclear Reactor Engineering Organization, to Allis-Chalmers Manufacturing Company. The agreed purchase price was the book value of the assets held by the Organization plus $300,000. In computing its District of Columbia Franchise Tax for the year of the sale, ACF treated the transaction as a sale of a capital asset giving rise to no tax liability by virtue of the District's capital gains exclusion.[1] In 1963, the District of Columbia assessed petitioner an additional tax on the theory that a part of the $300,000 realized on the sale should have been included as taxable income. ACF paid the additional assessment and then brought an action in the District of Columbia Tax Court for refund. During the proceedings in the Tax Court the District abandoned its original theory[2] and claimed that the entire $300,000 was taxable.

The case was tried below on stipulations of all facts deemed essential. Thus it was agreed that the Nuclear Reactor Engineering Organization was formed in 1954 as an unincorporated division of ACF Industries, a New Jersey corporation, to enable ACF to enter the commercial reactor field. The first contract utilizing the services and facilities of the Organization was entered into in 1956. Since that time five more contracts for the design, engineering and construction of nuclear reactors have been signed. Since May, 1956, the location of the Organization has been in the District of Columbia. Finally, it was stipulated that in 1959 "a contract was entered with [Allis-Chalmers] under which ACF sold as a going concern its Nuclear Reactor Engineering Organization, which sale included all assets for their book value subject to liabilities, plus $300,000. The gain to ACF on this sale was the $300,000 paid over and above the net assets." On these facts the Tax Court held in favor of ACF and the District petitioned for review.

I

■ . To determine if the gain from this sale is entitled to capital gains treatment, we must first consider whether, under the District of Columbia Income and Franchise Tax Act, the sale of an entire business should be treated as the sale of a single asset[3] or as the sale of an aggregate of individual assets. In Williams v. McGowan, 2 Cir., 152 F.2d 570 (1945), the Second Circuit announced the rule that has since prevailed in cases arising under federal tax laws,[4]

---

1. 47 D.C.CODE § 1557a(b) (11) (1961) excludes from "gross income" all "[g]ains from the sale or exchange of any capital assets as defined in this subchapter." In 47 D.C.CODE § 1551c(*l*) (1961), "capital assets" are defined as "any property, whether real or personal, tangible or intangible, held by the taxpayer for more than two years (whether or not connected with his trade or business), but [not including] stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the end of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

2. The District's original theory, not argued either here or in the Tax Court, was apparently that ACF must include as gross income that portion of the purchase price attributable to anticipated receipts on unperformed contracts which were entered into within two years preceding the sale. During oral argument counsel for the District disclaimed any reliance on this theory.

3. Compare Hatch's Estate v. Commissioner of Internal Revenue, 9 Cir., 198 F.2d 26 (1952).

4. Rev.Rul. 55–79, 1955 CUM.BULL. 370; Cohen v. Kelm, D.Minn., 119 F.Supp. 376 (1953); and see 3B MERTENS, FEDERAL INCOME TAXATION § 22.48 (1958), and 1 P-H 1965 FEDERAL TAXES ¶ 5044.

namely, where an entire business is sold it should be "comminuted into its fragments, and these are to be separately matched against the definition" of a capital asset.[5] Where no policies appear to require otherwise, we have generally, if implicitly, assumed that Congress intended similar construction of both the local and the federal tax statutes,[6] thus recognizing the practical convenience gained by having similar tax rules. Since no countervailing policies appear in this case, we adhere to the federal rule that where an entire business is sold it is to be treated, not as a unit, but as an aggregation of its assets.

 Under this rule, the total purchase price must be apportioned among the assets of the business, assigning to each asset an amount related to reasonable market value at the time of the sale.[7] But in this case, the record shows no such apportionment, or even a plausible basis for such apportionment. The total purchase price was never disclosed.[8] The stipulation on which each side relies to sustain its position does not in fact contain sufficient information to sustain the position of either side. The use of stipulations in tax cases is unquestionably a sound practice, supported by both rule[9] and decisions of this court,[10] but when the stipulation is not complete, evidence must be adduced on unstipulated issues of material facts.

 Ordinarily, since the taxpayer bears the burden of establishing his claim for refund, inadequacies in the record will result in judgment in favor of the District. In this case, however, each side carried some burden because of the District's change in position after the petition had been filed.[11] Since the record cannot sustain the contentions of either party, we deem it best to vacate the judgment of the Tax Court and remand the case for new trial in which the guidelines set forth herein can be applied.

 Making the necessary apportionment will often, as here, involve the problem of determining how much of the price, if any, should be allocated to good will. Resolution of this problem requires that the court determine whether any good will existed at the time of the sale and, if so, what its value was.[12] The lack of any clear conception of what good will encompasses has made this problem very complex,[13] but methods for its prac-

---

5. Williams v. McGowan, *supra*, 152 F.2d at 572.

6. Cf. Bord v. District of Columbia, 120 U.S.App.D.C. ——, 344 F.2d 560 (1965); District of Columbia v. Oppenheimer, 112 U.S.App.D.C. 239, 240, 301 F.2d 563, 564 (1962).

7. Rev.Rul. 55–79, *op.cit.supra* Note 4; 3B MERTENS, *op.cit.supra* Note 4 at § 22.51.

8. The price is referred to only as the book value of the assets plus $300,000. Nowhere is there any indication of what that book value may be, nor is there any clear delineation of what the assets were. During the oral argument counsel for the District stated he had no knowledge of what the total purchase price was.

9. See Rule 21(b) of the Rules of Procedure Before the Tax Court for the District of Columbia.

10. See, *e.g.*, Verkouteren et al. v. District of Columbia, 120 U.S.App.D.C. ——, 346 F.2d 842 (1965).

11. Rule 22 of the Tax Court rules of procedure states:
"The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in its answer, it shall be upon the District."

12. Much of the discussion in the briefs and during the oral argument centered on this problem. In view of the disposition which we make of the case we do not reach the question of whether any good will was transferred with the business sold in this case.

13. See McDonald, Goodwill and the Federal Income Tax, 45 VA.L.REV. 645 (1959); Wright, The Nature and Basis of Legal Good Will, 24 ILL.L.REV. 20 (1929); 10 MERTENS, FEDERAL INCOME TAXATION § 59.29 (1964); and *cf.* Metropolitan Bank v. St. Louis Dispatch Co., 149 U.S. 436, 446, 13 S.Ct. 944, 37 L.Ed. 799 (1893).
"Good will" has been defined broadly as "the potential * * * to realize earnings in excess of the amount which

tical resolution in a variety of factual settings have been developed in federal tax cases. Several factors are usually considered as elements of good will. One is the expectation that the business will continue to enjoy a certain amount of patronage.[14] Another is the expectation of continued efficiency because the persons employed in the firm are highly trained in the performance of their jobs and can be expected to continue their employment with the firm.[15] Insofar as either of these factors, or others included in the generic term "good will," can be transferred, they have been recognized as assets which might account for the difference between the actual purchase price and the sum of the individual market values of the more tangible assets.

■ The burden of making the allocation of the money received for the property sold is held to be on the taxpayer.[16] The taxpayer, therefore, carries the initial burden of establishing both the existence of good will and the value to be assigned to it. If the parties to the sale have allocated the value by agreement, the practice followed in federal cases of giving great weight to that allocation [17] should be followed. In cases where there is no allocation by agreement, the proper allocation can be made only by considering the "circumstances of the business as a whole in the light of its history up to the time of the transfer date * * *." [18]

■ ■ In addition to the existence of good will, a determination of the time it came into existence may become relevant in some cases, as it has here, because of the two-year holding period required under the District tax statute [19] for treatment as a capital asset. This determination is also one which must be made in the first instance by the Tax Court, in light of the facts of each case. However, some guidelines are possible. When the business has operated for an appreciable length of time prior to the two-year period before the sale, it can ordinarily be assumed that good will existed for the required capital asset holding period. In some cases this assumption may not be borne out by the evidence. For example, the good will may have been purchased from another business at some time within the two-year period, or it may have been created by an intensive campaign specifically designed to produce good will. In such cases, the holding period can clearly be said to commence at the time of the purchase or creation. But absent some significant event, such as those mentioned, which would fix the acquisi-

might be considered a normal return from the investment in the tangible assets," with no specification of what factors give rise to the potential. Friedlaender v. Commissioner, 26 T.C. 1005, 1017 (1956).

14. Karan v. C.I.R., 7 Cir., 319 F.2d 303, 306 (1963); Nelson Weaver Realty Company v. C.I.R., 5 Cir., 307 F.2d 897, 901 (1962); Brooks v. Commissioner, 36 T.C. 1128, 1133 (1961).

15. In LeVine v. Commissioner, 24 T.C. 147, 155–156 (1955), the court listed as a factor included in good will the fact that the selling firm had "assembled and trained a group of highly skilled employees accustomed to working together." In the present case, a letter from Allis-Chalmers to the District of Columbia was introduced in evidence. The letter stated that "the $300 thousand which we [Allis-Chalmers] paid for the business in excess of its total equity was:
"A. To obtain a going business.
"B. To enhance our position in foreign lands.
"C. To acquire the highly technical personnel associated with ACF."

16. Newton v. Commissioner, 12 T.C. 204 (1949); and see Copperhead Coal Co., ¶ 58,009 P-H Memo TC (1958).

17. 3B Mertens, op.cit.supra Note 4 at § 22.51.

18. Mossman, Yarnelle & Co. v. Commissioner, 9 B.T.A. 45, 54 (1927). See generally 10 Mertens, op.cit.supra Note 8 at §§ 59.29–.37.

19. 47 D.C.Code § 1551c(l). It is well settled that good will can qualify as a capital asset if held for the required length of time. See C.I.R. v. Killian, 5 Cir., 314 F. 2d 852 (1963).

tion of good will at some time after the commencement of the business, it should be assumed that it came into being at the time the business established itself as a going concern.[20]

## II

As an alternative ground to support its conclusion that ACF incurred no liability for District franchise tax, the Tax Court states:

"It should be added * * * that the purchaser of the Organization was Allis-Chalmers of Milwaukee, Wisconsin; and that, even if it could be held that the asset sold was not a 'capital asset', the source of the income was in Wisconsin and not in the District of Columbia, and the gain therefor was not taxable income."

Presumably, this holding is based on 47 D.C.Code § 1580 (1961) and, more specifically, on the following language appearing in that section:

"* * * The measure of the franchise tax shall be that portion of the net income of the corporation * * * as is fairly attributable to any trade or business carried on or engaged in within the District and such other net income as is derived from sources within the District * * *."

The phrase "income as is derived from sources within [the taxing jurisdiction]" has a history of usage in tax legislation, and it is only by reference to this history that any meaning can be ascribed to the phrase as it appears in the District tax code. It appeared first in the Revenue Act of 1916.[21] In the Revenue Act of 1921,[22] Congress gave it the definition which has been substantially unchanged through the intervening revenue acts to the present date.[23] "[I]ncome from sources within the United States" was defined to include, *inter alia*, "[g]ains * * * from the sale of real property located in the United States."[24] Gains from the sale of personal property were included if the sale took place within United States territory.[25] The "place of sale" has generally been thought to be the situs of the property at the time title passes.[26]

On remand, these criteria should be applied to the facts as developed, to determine if any income is "derived from sources within the District" under 47 D.C.Code § 1580.

Remanded for a new trial.

---

20. The length of time necessary to establish the existence of good will varies with the type of business involved and the factors going to make up the good will. In the sale of a retail store, for example, where the good will is largely the expectation of continued patronage, it is reasonable to assume that no such expectation existed until the business had been carried on for some time. See Friedlaender v. Commissioner, *supra* Note 13. In the present case, the good will, or, more precisely, the "going concern value," if any, might consist in good part of the organization of a pool of highly trained personnel. See the letter quoted *supra* Note 15. It is likely that this type of good will could come into being immediately upon organizing the business.

21. Revenue Act of 1916, § 10, 39 STAT. 765. See generally, 8 MERTENS, FEDERAL INCOME TAXATION § 45.26 (1964); H.R.Rep. No. 1480, 88th Cong., 2d Sess., pp. 197–217 (1964).

22. 42 STAT. 227.

23. The present provisions are found in 26 U.S.C. (I.R.C.1954) § 861.

24. Revenue Act of 1921, § 217(a) (5), 42 STAT. 244.

25. Revenue Act of 1921, § 217(e), 42 STAT. 245.

26. See 8 MERTENS, *op.cit.supra* Note 21, § 45.39. It would be highly unrealistic in this case to regard the situs of the Organization's good will as anywhere other than the situs of the tangible assets giving rise to it.